You UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SUNTRUST BANKS, INC., | CASE NO. C18-840 MJP |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| BE YACHTS, LLC et al., | |
| Defendants. | |

This matter was tried to Court without a jury beginning on the 15th, 16th, and 17th day of June, 2020, before the Honorable Marsha J. Pechman, Senior United States District Court Judge. Plaintiff SunTrust Banks, Inc. ("SunTrust") was represented by Daniel A. Armstrong and R. Isaak Hurst of the International Maritime Group, PLLC.  Defendants Be Yachts, LLC ("Be Yachts") and Edward Balassanian were represented by Anna K. Johnsen of Anna Johnsen Law PLLC.  The Court, having considered the evidence before it, including the testimony of witnesses and the documents and exhibits which were admitted by the Court, having heard argument and considered the briefs and memoranda of counsel, and having reviewed the facts and records of this action, makes the following findings and conclusions:

**FINDINGS OF FACT**

Based on the evidence presented at trial, the Court makes the following findings of fact:

1.      Defendant Edward Balassanian, through his solely-owned company Be Yachts, LLC, borrowed $1,800,000 from SunTrust Banks in January of 2013 to fund the purchase of a 63-foot luxury yacht, a new 2013 Sunseeker International Manhattan 63 Motor Yacht ("Vessel").

2.      Defendant Balassanian signed a SunTrust Marine Installment Note, First Preferred Ship Mortgage, and a Borrowing and Guaranty Resolution personally guaranteeing the $1,800,000 debt.

3.      Defendants agreed to repay the loan balance in 240 monthly installments of $11,632.02 commencing on March 1, 2013. The interest on the Marine Installment Note was 4.75%, and the payments Defendants agreed to make to SunTrust over the course of the 240 monthly installments (excluding early payments) totaled $2,791,684.80.  The vessel was named the Just Be.

4.      Defendants began to default on their payments and the Vessel was repossessed on February 3, 2015. Defendants redeemed the loan shortly thereafter and the Vessel was returned. In the following months, Defendants again began missing payments and the loan fell back into default.

5.      As a result of Defendants' default, SunTrust exercised its right to accelerate the loan. On February 17, 2016 Defendant Balassanian was informed that under the terms of the contract and SunTrust's policies he could no longer reinstate the loan by paying the arrears and that he would have to pay off the full loan balance to avoid repossession of the Vessel. Defendants failed to cure their arrears under the Marine Installment Note.

6. On February 12, 2016 SunTrust tasked Nielsen Beaumont Marine, Inc. ("Nielsen Beaumont") with the general management of the second repossession of the Vessel.

7. Nielsen Beaumont hired a local custodian (Waypoint Marine, Inc.) to repossess the Vessel on February 12, 2016.

8. Both Nielsen Beaumont and Waypoint Marine maintained all necessary licenses, insurance, and bonds during this repossession.

9. On or about February 17, 2016, SunTrust sent a letter to Defendants informing them that it had repossessed the Vessel and that the Vessel would be sold at a private sale sometime on or after March 4, 2016.

10. Defendants failed to cure the default and the Vessel was sold on March 10, 2017.

11. Immediately following repossession, on February 12, 2016, the Vessel was moved to Waypoint Marine's facility, located at the East end of the Ballard locks in Seattle, Washington. Waypoint Marine is a secure, locked facility with operations that include a boat repair yard. To protect the Just Be by guarding against theft and vandalism, it was locked to its moorage. Potential buyers were able to visit the vessel and conduct sea trials if requested.

12. The Vessel was located at the Waypoint Marine facility until SunTrust directed that the Vessel be moved to the Seattle Boat Show in September of 2016.

13. Immediately following the Seattle Boat Show, the Vessel was returned to the Waypoint Marine facility and reconnected to power.

14. While in the care of Waypoint Marine, the Vessel was maintained and cleaned and the engines and generator were run.

15.     In January of 2017, the Vessel's generator began to overheat and SunTrust directed Nielsen Beaumont to undertake repairs to the generator, which was repaired to operating condition.

16.     When one of the display monitors on the Vessel was found to be malfunctioning, and the manufacturer refused to replace the part under warranty, SunTrust paid Nielsen Beaumont $7,915.76 to repair the display monitor to ensure that the Vessel would remain marketable.

17.     The Vessel was not damaged in any way while in the custody of Waypoint Marine.

18.     At the request of Defendants, SunTrust appointed Bill Evans of Blue Water Marine Surveyors to conduct a survey of the Vessel to determine its fair market value.

19.     On February 23, 2016 Mr. Evans conducted a survey of the Vessel and determined it to be in "above average" condition.  Evans attached a report to his survey from BUC ValuePro suggesting a current retail value range of the same model yacht to be between $1,365,000 - $1,485,000; however, Evans' survey determined a fair market value of the vessel of between $1,500,000.00 and $1,700,000.00. The survey report also qualified the valuation, noting that distressed sales or forced-liquidation sales of vessels may entertain offers 60 to 70 percent of asking price.

20.     Nielsen Beaumont appointed Rick Young of Silver Seas Yachts as sales broker for the Vessel. Mr. Young maintained all necessary insurance bonds and was a licensed vessel broker in California and Florida.

21.     Young specialized in brokering sales of luxury yachts such as the JUST BE. Young traveled frequently to the Seattle area and worked with a local sales force to monitor and

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4

show the just Be to potential buyers.  Young prepared a market analysis for the Vessel and submitted it to Neilson Beaumont, which was then forwarded to SunTrust.  Young's market analysis noted that, worldwide, seven yachts of similar make, model and size had sold recently at prices ranging from a high of $1,850,000.00 to a low of $1,043,000.00, with an average sale price of $1,400,000.00.  Young also reached out to a Sunseeker dealer and the manufacturer was contacted to find what the Manhattan 63s were being sold for.  The price ranged from $2,100,000.00 to $2,200,000.00.

22.     Only one comparable Sunseeker model had sold in the U.S. in the past three years, making it difficult to narrow the range of the fair market value of the Vessel.  In addition, the Sunseeker is not a popular model in the Northwest due to weather and its open console design.  The manufacturer of the Vessel implemented an aggressive pricing strategy for new yachts that put downward pressure on the sales prices of used Sunseeker yachts in 2016.  Young reasoned the value of the Euro in 2016 was weak compared to the U.S. Dollar, making new European yacht models, such as new models produced by Sunseeker, inexpensive while also making used yachts more difficult to sell.

23.     Young suggested that the Vessel should be listed for $1,599,000.00 and could be expected to obtain a final sales price of approximately $1,300,000.00.  SunTrust instructed that the Vessel be initially listed at $1,700,000.00.

24.     Marketing is dominated by websites.  The Vessel was listed on Yachtworld.com, BoatTrader.com, SilverSeaYachts.com, Boats.com and approximately 10 other websites and publications and listed using the BoatWizard MLS.  Young also sent email broadcasts out to his list of prospective purchasers and clients.  Young also sent the listing to his broker contacts.

1    25.    The Just Be was shown to potential purchasers without delay when interest was

2    shown.

3    26.    Nielsen Beaumont also informed potential purchasers of the listing.

4    27.    SunTrust received its first offer for the Vessel in the amount of $1,000,000.00

5    from Arthur LJ Properties. SunTrust made a counteroffer of $1,600,000.00, but the counter was

6    not accepted. No further offers were received from Arthur LJ Properties.

7    28.    On April 21, 2016, SunTrust received a second offer for the Vessel from Alberto

8    Kamhazi in the amount of $1,225,000.00. Young negotiated a higher offer the same day from

9    Kamhazi in the amount of $1,318,000.00.

10    29.    SunTrust reviewed the offers and requested a counteroffer be made of

11    $1,450,000.00 based upon the survey of the Vessel conducted by Evans.

12    30.    On or about April 26, 2016, Kamhazi responded to SunTrust's counteroffer with a

13    final offer of $1,350,000.00.

14    31.    Based on the apparent lack of interest in the Vessel, SunTrust accepted the

15    $1,350,000.00 offer on April 28, 2016.  SunTrust's offer acceptance was communicated to

16    Kamhazi, however, he did not remit any funds and failed to fulfill the terms of his purchase

17    agreement.  SunTrust was informed that Kamhazi's offer was contingent on the sale of another

18    yacht, which did not sell, depriving Kamhazi of the funds required to purchase the Vessel.

19    32.    After the Kamhazi offer failed to materialize and noticing that the offers coming

20    in were far below the range of values suggested by Defendants' chosen surveyor, Mr. Evans,

21    SunTrust commissioned a second survey of the Vessel from Charles Solarek of CWS Maritime

22    Services. SunTrust had not previously used CWS Maritime Services, but its brokers had used

23    them in the past, although infrequently. SunTrust had no special relationship with CWS

24

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 6

Maritime Services.  Solarek inspected the Vessel on June 9, 2016 and estimated the fair market value of the Vessel to be between $1,365,000.00 and $1,485,000.00, much closer in line with the expected value suggested by Young in his market analysis.

33.    Based on these factors SunTrust lowered the listing price to $1,400,000.00.  After reducing the listing price, SunTrust received another offer of $1,100,000.00 from Ron Sweet on June 28, 2016.  In order to obtain a sales price near the high end of the recent survey conducted by Solarek, SunTrust made a counteroffer of $1,300,000.00 to Sweet.  Sweet did not accept SunTrust's counteroffer or propose an additional counteroffer himself.

34.    The marketing efforts of Young at Silver Seas Yachts and the efforts of SunTrust yielded yet another offer for the Vessel of $1,100,000.00 from Four Reel, LLC on July 22, 2016. SunTrust again made a counteroffer of $1,350,000.00, but Four Reel, LLC did not accept the counteroffer or submit an additional counteroffer.

35.    On August 26, 2016 Young proposed that SunTrust enter the Vessel into the Boat Afloat Show on South Lake Union in Seattle.  Boats Afloat is the largest boat show in the Pacific Northwest.  SunTrust agreed to this marketing strategy and authorized payment of $5684.20 for the costs associated with entering the Vessel in the Boats Afloat Show (hereinafter the "Seattle Boat Show") from September 10-19, 2016.

36.    During the Seattle Boat Show, SunTrust received a purchase offer for $1,000,000.00 from Arthur Aslanian.

37.    Shortly thereafter SunTrust received another offer for $1,050,000.00 from Dean Jones.

38.    At SunTrust's request, Young attempted to negotiate higher offers.  Alternately, Young negotiated a $60,000.00 credit for repairs to close the sale with the Jones.  However, no

1  rationale or list of necessary or anticipated repairs was offered except to "close the sale."  Young

2  was not able to obtain a higher counteroffer and no higher offers were received from that time

3  until the Vessel was sold.

4      39.    Fall yachting season shows a slowing of the yacht market and SunTrust was faced

5  with the costs of storing and maintaining the Vessel through winter and spring.

6      40.    The sale of the Vessel to Jones was finalized on March 10, 2017 for

7  $1,050,000.00.  The aggregate amount of the obligation defendants owed to SunTrust as of

8  March 10, 2017 was $1,752,761.86.  Broker sales commissions are negotiated and vary

9  depending upon the price of the vessel, the relationship of the buyer's and seller's brokers and

10  generally whether a broker must give up "points" to make the sale.  Young's commission was

11  three percent with half going to the Silver Seas brokerage.

12  **CONCLUSIONS OF LAW**

13      Pursuant to the foregoing Findings of Fact, the Court concludes as follows:

14      1.    The burden of proof is a preponderance of the evidence.

15      **A.**    **Breach of Contract**

16      2.    Defendants entered into a valid and binding Marine Installment Note with

17  SunTrust and borrowed $1,800,000.00.

18      3.    SunTrust and Defendants executed a valid and binding First Preferred Ship

19  Mortgage on the Vessel.

20      4.    Defendant Balassanian also signed a valid and binding Borrowing and Guaranty

21  Resolution whereby he personally guaranteed the Marine Installment Note.

22      5.    The Just Be was a consumer good and was used for recreation and housing

23  purposes.

24

6.      SunTrust fulfilled all of its obligations under the Marine Installment Note, the Preferred Ship Mortgage and the Borrowing and Guaranty Resolution.

7.      Defendants defaulted on their obligations under the Marine Installment Note, the Preferred Ship Mortgage and the Borrowing and Guaranty Resolution by failing to make payments when due under the Marine Installment Note.

8.      Defendants breached the terms of the Marine Installment Note by failing to make payments when due.

9.      Defendants breached the terms of the Marine Installment Note by failing to pay off the full loan balance following default and acceleration.

10.     Had Defendant's fulfilled their obligations under the terms of the Marine Installment Note, SunTrust would have been entitled to return of the amount financed plus an approximate finance charge of $991,684.80.

11.     SunTrust was damaged by Defendants' breach of the Marine Installment Note.

12.     The aggregate amount of Defendants' obligation to SunTrust under the Marine Installment Note as of March 10, 2017 was $1,752,761.86.

13.     Following the sale of the Vessel, SunTrust was entitled to the aggregate amount of the obligation ($1,752,761.86), less the proceeds from the sale of the Vessel ($1,050,000.00), plus the repossession expenses ($153,692.74), plus accumulated fees and costs ($25.00) plus late charges ($1,500.00), less miscellaneous rebates and credits ($0.00).  SunTrust failed to establish the need for or produce testimony about the $60,000.00 credit negotiated by Rick Young and why it was necessary or what it was to cover.  Although the sale was reasonable, the accounting for Defendants' shortfall was in error.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9

14.    The total amount of the resulting deficiency owed by Defendants' to SunTrust is $857,979.60 minus $60,000.00 ($797,979.60).

15.    Plaintiff has proven its breach of contract claim.

**B.    Reasonable Care in the Preservation of Collateral**

16.    SunTrust used reasonable care in the custody and preservation of the Vessel while it was in SunTrust's possession.

17.    SunTrust hired Nielsen Beaumont, which is a company with extensive experience in the sale of repossessed vessels such as the JUST BE.

18.    Nielsen Beaumont subcontracted the repossession and storage of the Vessel to an experienced and reputable company, Waypoint Marine, which has substantial experience managing and storing yachts such as the JUST BE.

19.    SunTrust prevented the Vessel from deteriorating, sustaining damage, or losing value.

20.    SunTrust fulfilled the duties imposed by RCW 62A.9A-207 and UCC § 9-207 as adopted by the states to the extent applicable.

**C.    Commercially Reasonable Marketing**

21.    SunTrust marketed the Vessel in the usual manner for luxury yachts of a similar type and in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

22.    SunTrust adequately supervised the essential aspects of the marketing and sale of the Vessel.

23.     SunTrust, and its broker made reasonable efforts, in keeping with industry standard practices, to reach segments of the public that they reasonably expected would be interested in purchasing the Vessel.

24.     Every aspect of SunTrust's disposition of the Vessel, including the method, manner, time, place, and terms of the disposition, were commercially reasonable.

25.     SunTrust's efforts to market and sell the Vessel complied in every respect with the requirements set out in RCW 62A.9A-610 and RCW 62A.9A-627, as well as UCC § 9-610 and UCC § 9-627 as adopted by the states to the extent applicable.

26.     The Vessel was marketed and sold by an experienced yacht broker who negotiated with every interested buyer in an effort to obtain the highest possible sales price for the Vessel and managed to attract eight offers for the Vessel from March 2016 to January 2017.

27.     Young's efforts as broker were conducted in the usual manner of brokers working in the luxury yacht industry, especially that of repossessed vessels.

28.     The advertising efforts of Young and Nielsen Beaumont were in conformity with yacht industry standards and practices, especially that of repossessed vessels.

29.     The moorage location of the Vessel at Waypoint Marine's facilities was an appropriate venue to store and show the Vessel to interested parties and did not render SunTrust's disposition and sale of the Vessel commercially unreasonable.

30.     It was not commercially unreasonable for SunTrust to use a vessel broker who did not possess a dealer license issued by the State of Washington.

31.     SunTrust did not violate Washington law by hiring a broker who did not possess a vessel dealer license.

32.     SunTrust properly vetted Nielsen Beaumont and took commercially reasonable steps to ensure that Nielsen Beaumont and any other brokers that Nielsen Beaumont may subcontract the sale of the Vessel to, would be properly licensed as required by the jurisdictions they operated in.

33.     The commission offered by SunTrust did not unreasonably hinder the sale of the Vessel and did not render SunTrust's marketing efforts commercially unreasonable.

**D.     Commercially Reasonable Sale**

34.      SunTrust sold the Vessel in accordance with well-established practices in the luxury yacht industry, especially that of repossessed vessels.

35.     SunTrust and its agents, Nielsen Beaumont and Young, analyzed global sales figures for yachts of similar make, model and size over the past three years in order to determine an accurate fair market value for the Vessel. Young reached out to a vessel dealer and the Vessel manufacturer to determine the current price of a new yacht of similar make, model and size and accounted for that number in his market analysis.

36.     It was commercially reasonable for SunTrust to select the initial listing price of $1,700,000.00, which was the highest value suggested by Defendants' own chosen surveyor.

37.     It was commercially reasonable for SunTrust to commission a second survey after receiving multiple serious offers far below the initial listing price.

38.     It was commercially reasonable for SunTrust to reduce the listing price of the Vessel based upon the second survey and the offers it had received from March to June 2016.

39.     Because the sale of the Vessel was sold in a forced liquidation sale, it would not be commercially reasonable to expect the Vessel to sell for the full fair market value suggested by Defendants' chosen surveyor.

40.     The final sale of the Vessel for $1,050,000.00, was commercially reasonable.

41.     SunTrust took sufficient measures to mitigate its damages.

42.     Defendants have failed to establish that the sale of the Just Be was not commercially reasonable; they are therefore not entitled to damages under RCW 62A.9A-625.

**JUDGMENT**

For the foregoing reasons, the Court finds that SunTrust Banks, Inc. is entitled to judgment in its favor in full.

1.     Defendants' counterclaims are dismissed with prejudice.

2.     SunTrust Banks, Inc. is awarded $797,979.60 for its claim for breach of contract.

3.     SunTrust Banks, Inc. may move for its reasonable fees and costs incurred in this case.

The clerk is ordered to provide copies of this order to all counsel.

Dated June 30, 2020.

Marsha J. Pechman
Senior United States District Judge